*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MYERS, Minors.

UNPUBLISHED
September 22, 2022

No. 359930
Kent Circuit Court
Family Division
LC No. 18-052510-NA;
18-052511-NA

Before: MURRAY, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

Respondent-father appeals by right the trial court's order terminating his parental rights to his two sons: SDM and SKM. The trial court ordered termination under MCL 712A.19b(3)(c)(*i*), (g), and (j). Because we conclude that respondent has not identified any errors that warrant relief, we affirm.

## I. DRUG ABUSE FINDINGS

### A. STANDARD OF REVIEW

Respondent argues that the trial court erred in several respects when it made findings involving his drug use. This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes. See *In re Gonzales/Martinez*, 310 Mich App 426, 431; 871 NW2d 868 (2015). This Court, however, reviews the trial court's factual findings underlying its application of the law for clear error. *Id.* at 430; see also MCR 3.977(K). A finding is clearly erroneous when this Court is left with the definite and firm conviction that a mistake has been made. *In re Gonzales/Martinez*, 310 Mich App at 430-431.

### B. ANALYSIS

A trial court may terminate a parent's parental rights to a child if it finds by clear and convincing evidence that the petitioner established one or more grounds for termination. See MCL 712A.19b(3). Once a trial court finds that the Department of Health and Human Services (the Department) has established one or more grounds for termination, it must terminate the parent's

-1-

parental rights if it also finds that termination is in the child's best interests. See MCL 712A.19b(5).

Respondent first argues that his positive test for cocaine and related evidence when making its findings were insufficient to warrant terminating his parental rights. He also argues that the trial court should have waited for the results of his hair follicle test and should have concluded that respondent's involvement with drugs was—at most—recreational and did not implicate his ability to parent.

As respondent recognizes, the trial court did not terminate respondent's parental rights solely on the basis of his purported drug use. The trial court identified numerous barriers to respondent's reunification with the children: substance abuse, domestic relations, emotional stability, resource management, parenting skills, and child characteristics. The continued existence of these barriers implicated grounds for terminating his parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). Even concerning the barrier of substance abuse, the trial court did not find that respondent had been using substances. Rather, the trial court found that he did not "have the supports for preventing a relapse" because he refused to admit that he had ever had a drug problem and did not participate in any drug abuse prevention services after his release from prison.

The trial court identified this barrier as only one of many barriers to respondent's ability to parent his children safely, and respondent has not stated how any error involving the trial court's findings about his drug use prejudiced the outcome of his termination hearing. Even if the trial court erred about respondent's drug use, the existence of the other barriers would still establish grounds for terminating his parental rights, at the least, under MCL 712A.19b(3)(c)(*i*). Accordingly, respondent has not met his burden to demonstrate that any error in this finding warranted relief. See MCR 3.902(A); MCR 2.613(A). In any event, a careful review of the record shows that the trial court did not clearly err when it found that respondent's substance abuse problem continued to be a barrier.[1]

Respondent also argues that the trial court should have postponed the termination hearing to await his late hair follicle test, but, given the record, respondent had had ample opportunity to act before the termination hearing and failed to do so. Moreover, there was no evidence in the record about how his hair removal and delays might have affected the test results. Given the

---

[1] Respondent had a lengthy criminal record that included significant offenses associated with substance abuse. He had been arrested for possession of marijuana and possession of cocaine, and for maintaining a drug house. By July 2019, he had completed serving a sentence for driving under the influence, third offense. As a result of his last incarceration, respondent was unable to care for his children and could not prevent them from being neglected while in his wife's care. From September 2019 through February 2020, which was a few months after his release from prison for an offense arising from substance abuse, respondent tested positive for cocaine. Although respondent tested negative for substances for 31 of his tests in 2021, he tested positive for cocaine in May 2021. He suggests on appeal that the positive results were unreliable and could not be considered in terminating his parental rights. The record, however, supported a finding that the test results were accurate.

record, the trial court cannot be faulted for making its findings on the basis of the evidence before it.

Respondent further argues that—even if the evidence established that he was using drugs—there was no evidence that his drug use was anything other than recreational, and there was no evidence that his recreational use posed a danger to his children. His argument is unpersuasive. The evidence showed that respondent had repeatedly been arrested for behaviors associated with his drug use and that, as a result, he was unable to parent his children, and they suffered from trauma associated with his arrest and incarceration. Consequently, there was a direct connection between his failure to rectify the barrier presented by his abuse of substances and the harm that the children entrusted to his care had suffered and might suffer again if he had a relapse. And this finding alone established grounds for terminating respondent's parental rights under MCL 712A.19b(3)(c)(*i*).

## II. ANTISOCIAL PERSONALITY DISORDER

### A. PRESERVATION AND STANDARD OF REVIEW

Respondent next argues that the trial court erred when it considered evidence about his diagnosis of antisocial personality disorder without admitting the psychological evaluation and erred when it terminated his parental rights on the basis of that diagnosis without requiring the Department to provide him with services to rectify it.

To preserve an issue for appellate review, the issue must have been raised in the trial court. See *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008). Similarly, to preserve an argument that the Department should have provided additional services to preserve and reunify the family, the parent must raise the issue at some time after the trial court adopted the case service plan and before the ultimate disposition. See *In re Atchley*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket Nos. 358502 and 358503); slip op at 2. This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes, *In re Gonzales/Martinez*, 310 Mich App at 431, and reviews the trial court's factual findings for clear error. *Id*. at 430. However, to the extent that respondent failed to properly preserve an issue for appellate review, this Court reviews that claim of error for plain error affecting his substantial rights. *In re Utrera*, 281 Mich App at 8. To establish a plan error that warrants relief, respondent must show that the trial court made a plain error that affected the outcome of the proceedings, or that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the outcome. See *id*. at 8-9.

Respondent never objected to the testimony about his psychological evaluation or otherwise asserted that it was improper for the trial court to consider the evaluation. He also did not argue that the evaluator had to be called at the termination hearing and never asserted that the Department had an obligation to provide him with services to help him overcome the problems associated with his diagnosis. Consequently, his arguments concerning the admission of the evidence concerning his psychological evaluation and whether the Department should have provided him with more services are unpreserved. See *id*.; *Utrera*, 281 Mich App at 8.

### B. ANALYSIS

-3-

The trial court formally admitted respondent's psychological evaluation, authored by Dr. Jeffrey T. Kieliszewski, at the hearing held in December 2019. On the basis of the testing and history, Dr. Kieliszewski diagnosed respondent as having a personality disorder—specifically, antisocial personality disorder.

The trial court had the authority to consider the record from all the previous dispositional hearings when determining whether the Department established its burden. See *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011) (recognizing that child protective proceedings are viewed as one continuous proceeding); *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009) (stating that the trial court may take judicial notice of its records). Moreover, respondent's psychological evaluation was admissible at the termination hearing, and the trial court could have considered it for all its probative value. See MCR 3.977(H)(2) ("At the hearing all relevant and material evidence, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value."). Accordingly, had respondent objected to the testimony at the termination hearing on the ground that the evaluation had not been formally admitted at that hearing, the trial court could have admitted the report. Similarly, had respondent wanted to cross-examine Dr. Kieliszewski, or controvert the report at the termination hearing, he had the right to do so. See MCR 3.977(H)(2). He chose not to call Dr. Kieliszewski and chose not to present any evidence to contradict his evaluation. On this record, respondent has not shown that the trial court plainly erred to the extent that it considered the evaluation and related testimony when making its findings of fact. *In re Utrera*, 281 Mich App at 8-9.

Likewise, respondent has not identified any services to treat antisocial personality disorder, and Dr. Kieliszewski specifically wrote that counseling was contraindicated because the prognosis was so poor. Instead, Dr. Kieliszewski identified services and efforts that the Department could use to safeguard the children if returned to respondent's care. The record shows that the Department followed Dr. Kieliszewski's recommendations. Therefore, respondent has also not demonstrated a plain error premised on the Department's failure to provide him with services tailored to his diagnosis. See *id*.

Nor has respondent shown that the trial court's findings involving his diagnosis were clearly erroneous. The trial court stated that antisocial personality disorder was not treatable through counseling, and found that respondent had engaged in conduct that was consistent with his diagnosis, and that emotional stability remained a barrier and a danger to the children. The finding was entirely supported by the record. Dr. Kieliszewski wrote that persons such as respondent were prone to instability, criminality, and drug use, which was consistent with respondent's history and constituted evidence that, on the basis of his personality disorder, respondent was likely to again involve himself in unstable living situations, engage in criminal activity, and abuse drugs. The trial court did not clearly err. See *In re Gonzales/Martinez*, 310 Mich App at 430-431.

Finally, although respondent argues that a diagnosis by itself does not constitute grounds for termination, as noted the trial court identified respondent's history of engaging in behaviors that exposed his children to neglect, noting that those acts and omissions had led to the children's removal. It then found that those barriers continued to exist and stated that respondent's antisocial personality disorder was just one of those barriers.

-4-

Respondent has not identified any error involving the trial court's use of the psychological evaluation or the testimony about the evaluation, and has not shown that the trial court's findings about his diagnosis were clearly erroneous.

## III. PARENTING TIME AND PREFERENCES

### A. STANDARD OF REVIEW

Respondent next argues that the trial court erred in several respects when it made its findings about SDM's behaviors before and after parenting time and concerning SDM's preferences. This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes. See *id*. at 431. This Court reviews the trial court's factual findings underlying its application of the law for clear error. *Id*. at 430.

### B. ANALYSIS

Respondent argues that the trial court erred when it considered the evidence that SDM had behavior problems before and after parenting-time visits with respondent and erred to the extent that it considered SDM's preferences in terminating respondent's parental rights. In discussing the children's best interests, the trial court recognized that there was some evidence that respondent developed a bond with SDM during parenting therapy. The court, however, stated that there was also evidence that SDM acted out before and after parenting sessions, which it characterized as trauma behaviors. From that, it found that the bond between respondent and SDM was not a healthy bond. It determined that that factor weighed in favor of finding that termination was in SDM's best interests. The trial court also cited SDM's behaviors as evidence that the parenting-time visits did not go well and that SDM preferred not to be placed with respondent.

Respondent does not contest the evidence that SDM acted out before and after visits with him. Rather, he states that there was no direct evidence that SDM acted out because he did not want to attend parenting time. He suggests that SDM might have been engaging in the disruptive behavior for ulterior reasons or as a result of acts by the foster family. Respondent's conjecture does not establish that the trial court clearly erred in its findings.

There was evidence that SDM had begun to act out before and after visits with respondent. Although there was evidence that SDM had uneventful visits with respondent and that respondent was appropriate during parenting visits, there was also evidence that SDM had a strong reaction because he feared respondent and did not want to visit with him. For example, SDM's therapist, Carmel McKentry, testified at the termination hearing that SDM was initially "ambivalent" about having parenting time with respondent. However, she stated, over the past year or more, SDM had consistently indicated to her "that he does not want to even have visits with dad. He does not want to talk to dad. He does not want to have any sort of relationship from what he tells me." SDM also told her that he feared respondent as a result of actual aggressive behaviors that he experienced or witnessed. And there was evidence that respondent twice used improper restraints against SDM during parenting time, which affected SDM dramatically. Likewise, a foster-care clinician, Brianna Bost, testified that SDM's behaviors always worsened at about the time of visits with respondent, and that SDM began to pull his own hair out to the point at which he had bald spots. SDM told her as well that he did not want to even talk about respondent.

This evidence—when considered in the context of other evidence—fully supported the trial court's finding that SDM had been acting out because he did not want to have visits with respondent, and not because of something done by the foster family. The same evidence supported the trial court's finding that SDM did not have a healthy bond with respondent and preferred not to be placed with him. Moreover, to the extent that there was a conflict in the evidence, this Court defers to the trial court's superior ability to resolve that conflict. See *In re Miller*, 433 Mich 331, 344; 445 NW2d 161 (1989); MCR 2.613(C); MCR 3.902(A). Accordingly, the trial court did not clearly err when it made those findings and weighed them in favor of finding that termination of respondent's parental rights was in SDM's best interests. See *In re Gonzales/Martinez*, 310 Mich App at 430-431.

Respondent also argues that, even if the trial court did not clearly err by factoring SDM's preference into its best interests finding for SDM, it erred by considering SDM's preference when finding that termination was in the best interests of SKM. It is certainly true that the trial court had the obligation to make individual findings concerning the best interests of SDM and SKM to the extent that their best interests significantly differed. See *In re White*, 303 Mich App 701, 715-716; 846 NW2d 61 (2014). However, the trial court repeatedly made separate findings about the best-interest factors for each child throughout its oral opinion. There is no indication in the record that the trial court improperly weighed SDM's preference as a ground for finding that termination was in SKM's best interests. Respondent's argument to the contrary is unsupported.

## IV. REVOCATION OF PARENTAGE

### A. STANDARD OF REVIEW

For his final argument, respondent maintains that the trial court improperly considered respondent's decision to revoke his paternity to his wife's two youngest children when determining whether to terminate his rights to his two biological children. This Court reviews de novo whether the trial court properly interpreted and applied the relevant statutes. See *In re Gonzales/Martinez*, 310 Mich App at 431. This Court reviews the trial court's factual findings underlying its application of the law for clear error. *Id*. at 430.

### B. ANALYSIS

With respect to respondent's assertion that his decision to revoke his paternity to his former wife's two youngest children had no relevance to any issue of fact before the trial court, the record shows that the trial court did not make improper inferences from respondent's decision to revoke his paternity. Instead, the trial court noted the evidence and drew reasonable inferences on matters that were pertinent to the matter before it.

As background, the evidence showed that respondent's former wife had her fifth child while respondent was imprisoned. She also had her last child under circumstances that strongly suggested that respondent was not the father. Because respondent was still married to her at the time, he was the children's legal father. After his release from prison, respondent and his wife lived together and pursued a joint case service plan. Respondent served as the father figure for the two youngest children during that time and participated in services related to them. Indeed, as the trial court aptly noted, there was evidence that the two youngest children thought of respondent as

their father and that some service providers were unaware that there was a paternity issue. But respondent made it clear to the Department from the very inception of services that he only intended to participate in the services on the assumption that he would remain with his wife, and would discontinue them if he and his wife ceased to be together. And when he and his wife ceased to be a couple, respondent revoked his paternity to the two youngest children.

The trial court noted respondent's treatment of the two youngest children as his own throughout the proceedings, but found that the evidence showed that respondent "slammed the door" on his relationship with the two youngest children after he and his wife separated. The trial court used this evidence to find that respondent lacked "insight" and showed that he had no "empathy to how this child might be affected by his decision." Notably, the trial court did not punish respondent for revoking his paternity, and did not use that fact as grounds for termination. Rather, the trial court simply drew inferences from his course of conduct involving the younger children and made findings on the basis of those inferences.

The evidence that respondent revoked his paternity within a short time after the relationship with his wife ended allowed at least the inference that respondent acted with disregard to the effect that revocation would have on his relationship with the children and the trauma that would arise from it. The trial court did not err.[2]

## V. CONCLUSION

Affirmed.

/s/ Christopher M. Murray
/s/ Colleen A. O'Brien
/s/ James Robert Redford

---

[2] Respondent maintains that the trial court in effect punished him for separating from his wife. It is true that respondent had been warned that his relationship with his wife was unstable and might jeopardize his ability to reunify with the children. However, respondent's relationship with his wife was a separate matter from his treatment of the children. Whether he continued to have a relationship with his wife did not prevent respondent from acting with insight and empathy when interacting with the two youngest children. And his separation from his wife did not require him to revoke his paternity. He could have continued to work for reunification with them or could have pursued a more empathetic path for introducing the change in their lives. The evidence concerning respondent's treatment of his legal children before he revoked his paternity was evidence that implicated whether he had empathy for his biological children and could develop insight into their needs. See *In re Kellogg*, 331 Mich App 249, 259; 952 NW2d 544 (2020).